[826 NYS2d 14]

CATHERINE MITSCHELE, Appellant, v LEONARD J. SCHULTZ et al., Respondents, et al., Defendants.

First Department, November 30, 2006

### APPEARANCES OF COUNSEL

*Law Offices of Neal Brickman*, New York City (*Ethan Leonard* and *Neal Brickman* of counsel), for appellant.

*Wilson, Elser, Moskowitz, Edelman & Dicker, LLP*, White Plains (*Martin J. Burns* and *Thomas R. Manisero* of counsel), for respondents.

### OPINION OF THE COURT

SAXE, J.

This action, brought by a client against an accountant, requires consideration of the interplay between claims of accounting malpractice and claims of fraud by an accountant.

In 1993, plaintiff Catherine Mitschele was hired by Richard Schultz, the president of Triad Securities Corporation, to work as a broker at Triad. Richard Schultz thereafter introduced plaintiff to his cousin, defendant Leonard Schultz, an accountant, whom plaintiff retained in 1994 along with his accounting firm, Kaplan & Schultz C.P.A., to provide accounting services to

her regarding a tax problem dating from 1986-1989. Thereafter, the firm of Kaplan & Schultz began advising plaintiff regarding her annual tax liability, and preparing her tax returns, beginning for the 1996 tax year.

In June 1996, plaintiff was transferred by Triad to London, where she was responsible for opening, managing, and operating the office of Triad's new foreign affiliate, Triad Securities, Ltd. In conjunction with this move to London, plaintiff consulted with Schultz regarding her tax status and tax liability as a United States citizen living and working in London. Defendant Schultz proposed a compensation arrangement through which, he erroneously asserted, plaintiff could best maximize her income and minimize her tax liability. This involved (1) the use of a foreign income exclusion, (2) the establishment of an offshore bank account in the Isle of Jersey, and (3) categorization by Triad of certain compensation to plaintiff as "1099" "outside contractor" income.

The specific acts of misconduct concern (1) preparing tax returns for plaintiff for calendar years 1997-1999 which failed to utilize the foreign income exclusion for income received in the offshore account; (2) advising plaintiff that she could deposit $70,000 to $80,000 per year in an offshore account on the Isle of Jersey without incurring any tax liability; and (3) arranging for Triad to treat plaintiff as an "outside contractor" instead of an employee, for monthly payments of $4,700 per month, and therefore withholding no taxes for that compensation. Although plaintiff said she believed it was wrong of Triad to use form 1099's and to fail to withhold taxes on those payments, Leonard Schultz, along with Richard Schultz, and Triad's accountants, assured her that the way they had set up her compensation was the best and only way.

The final U.S. tax return which defendant Leonard Schultz prepared for plaintiff was for the 1999 tax year, which he mailed to her on January 4, 2000.

In July 2000, plaintiff was terminated from her employment with Triad. She negotiated a settlement, receiving a gross amount of $1.3 million in November 2000. Although plaintiff notified Leonard Schultz, he provided no tax advice concerning the settlement.

In March 2001, when plaintiff contacted defendant Schultz about preparing her tax return for 2000, he told her that he could no longer handle her accounting or tax matters in view of her termination from Triad. When plaintiff thereupon retained

a new accounting firm, Shapiro & Lobel, her new accountant told her that her tax returns for the previous five years contained numerous improprieties, namely, failure to report all income, misreporting compensation as self-employment income, failure to report investment income earned abroad, failure to claim the foreign earned income exclusion or claim a credit for foreign tax paid. Plaintiff was therefore compelled to file amended returns for the years 1997 through 1999. She also had to hire a tax attorney, at a cost of $30,000, to resolve her problems with the IRS. She paid the IRS $139,000 in April 2001 and still owed it $92,005.37 as of April 7, 2003. Her tax liabilities are causing her difficulties in her attempts to get a new job. In addition, she asserts, her tax problems have caused her psychological trauma, for which she is being treated by a physician.

On April 7, 2003, plaintiff commenced this lawsuit, including causes of action for fraud, malpractice, and breach of contract.

Defendants moved for summary judgment dismissing all plaintiff's claims as time-barred. The IAS court granted defendants' motion, dismissing the complaint in its entirety.

Initially, the IAS court was correct in dismissing the breach of contract claim. Plaintiff's assertion in support of the claim is that defendant accountants violated their agreement to provide professional services in accordance with good and accepted professional standards. This is nothing more than a rephrasing of the claim of malpractice in the language of breach of contract, and is specifically covered by the three-year statute of limitations of CPLR 214 (6), which applies "regardless of whether the underlying theory is based in contract or tort" (*see 6645 Owners Corp. v GMO Realty Corp.*, 306 AD2d 97, 98 [2003]).

As to the accounting malpractice claim, absent fraud, such a claim accrues when the injury occurs, which is "when all the facts necessary to the cause of action have occurred," regardless of whether the plaintiff has yet become aware of the error (*see Ackerman v Price Waterhouse*, 84 NY2d 535, 541 [1994]). A claim of negligently given incorrect accounting information or advice therefore normally accrues, under *Ackerman*, upon receipt of negligently prepared tax documents (*id.* at 543).

Here, the complained-of erroneous advice was incorporated in plaintiff's 1997-1999 tax returns, and in any event was given more than three years prior to commencement of this action.

There are circumstances where the statute of limitations is tolled, precluding dismissal on timeliness grounds although the

alleged acts of negligence occurred more than three years prior to commencement of the action (see *Fred Smith Plumbing & Heating Co. v Christensen*, 242 AD2d 429 [1997]). This may occur where the parties engaged in a continuous professional relationship, such as where same accounting firm provided ongoing services in addition to the yearly preparation of tax returns; however, this tolling of the statute is only appropriate where the continuous representation was *in connection with the particular transaction which is the subject of the action* (see *Zaref v Berk & Michaels*, 192 AD2d 346, 347 [1993]). The mere recurrence of professional services does not constitute continuous representation where the later services performed were not related to the original services (see *Kearney v Firley, Moran, Freer & Eassa*, 234 AD2d 967 [1996]).

Here, plaintiff received the accountant's final work product, her 1999 tax return, on January 5, 2000, but did not commence this action until April 7, 2003. Although it is asserted that there were telephone conversations between plaintiff and defendant Schultz, there are no specific allegations that further tax or accounting advice was given to plaintiff subsequent to January 5, 2000. Indeed, defendant Schultz's March 2001 statement that he could no longer represent plaintiff is the antithesis of continuous representation, since the rationale of the continuous representation doctrine is that "a client cannot reasonably be expected to assess the quality of the professional service while it is still in progress" (*Zaref*, 192 AD2d at 347). Nor does his April 13, 2001 attempt to persuade plaintiff not to revise her prior tax returns establish continuous representation, particularly since by the time of that statement plaintiff had already retained a new accountant. The other April 2001 actions pointed to by plaintiff, namely asserting to plaintiff's new accountant that the old tax returns were proper, and instructing a Triad employee to create and place in plaintiff's personnel file a protective document asserting that the 1099 income was based upon consultation services provided in the U.S., are actions that defendant Schultz took to protect himself, not to represent plaintiff.

Consequently, the continuous representation doctrine does not save plaintiff's malpractice claim from dismissal on timeliness grounds.

Nor is equitable estoppel appropriate to protect the malpractice claim from the time bar. It was not the claimed fraud which induced plaintiff to refrain from filing a timely action (cf. *Simcuski v Saeli*, 44 NY2d 442, 448-449 [1978]).

However, the fraud cause of action should not have been dismissed. Plaintiff alleges that in addition to committing malpractice by arranging her compensation and her declaration of earnings on her tax returns in a certain fashion, defendants committed fraud by falsely telling her this arrangement was "the absolute best way to do it" and "the way it's got to be." It is asserted that this misrepresentation was made to her not in an effort to serve her interests, but for the sole benefit of Triad, so as to allow the corporation to avoid certain payroll taxes and other taxes and expenses. Plaintiff asserts she relied on Schultz's false assurances that her compensation had to be paid in this manner, and that she did not seek the advice of another accountant until March of 2001, when Schultz told her he could no longer handle her accounting or tax matters in view of her termination from Triad, and only upon consulting another accountant did she become aware of the falsity of their statements and of their malfeasance.

We reject the contention that plaintiff's fraud claim must be dismissed as untimely because it is not "separate and distinct from the customary cause of action for malpractice" (*see La-Brake v Enzien*, 167 AD2d 709, 711 [1990]). The *LaBrake* case discussed the type of scenario in which an attorney commits legal malpractice by failing to properly commence a lawsuit, and then lies to the client with assurances that the matter is underway, and claims for both malpractice and fraud are interposed. The Court there reiterated that "a defendant's concealment or failure to disclose his own malpractice without more does not give rise to a cause of action for fraud or deceit separate and distinct from the customary malpractice action" (167 AD2d at 711). It looked to the case of *Simcuski v Saeli* (*supra*), a case of physician malpractice followed by the physician's concealment of the malpractice, with regard to the elements that must be established to prove a cause of action for fraud separate from the malpractice claim, concluding that without damages separate from those arising from the malpractice, a fraud claim is not made out (167 AD2d at 711-712).

Here, however, defendants' alleged fraud is not simply the failure to disclose the malpractice based upon accounting errors. Rather, defendants are alleged to have perpetrated a fraud on plaintiff from the time they were retained to provide accounting services, in failing to disclose their concern with protecting the interests of another entity, namely, plaintiff's employer.

The elements of a fraudulent concealment claim—concealment of a material fact which defendant was duty-bound to dis-

close, scienter, justifiable reliance, and injury (*see Kaufman v Cohen*, 307 AD2d 113, 119 [2003]; *and see Ozelkan v Tyree Bros. Envtl. Servs., Inc.*, 29 AD3d 877 [2006])—are all sufficiently pleaded by the claims which may be properly gleaned from the complaint: that defendants failed to inform plaintiff of their conflicted interests, despite their professional obligation to make such disclosure, inducing plaintiff to retain them and rely on their advice in the belief that defendants had undertaken to provide professional advice in her best interests. The incorrect advice and improper income declarations, which form the substance of the malpractice claim, constitute merely a portion of the factual predicate for the fraud claim. The fraud claim depends primarily on defendants' failure to disclose their divided loyalties, and plaintiff's justifiable reliance on their ability conscientiously to give her advice serving her own best interest, while the improprieties in the tax returns merely help to establish that plaintiff was injured and assess the extent of her injury.

As this Court said in *Serio v PricewaterhouseCoopers LLP* (9 AD3d 330, 331 [2004]), when reinstating a fraud claim despite the prior dismissal, as time-barred, of accounting malpractice and related claims based upon the same professional relationship, fraud may still be "viable irrespective of whether some of the alleged acts and misrepresentations were mentioned in connection with the untimely causes of action sounding in professional malpractice."

Since plaintiff's fraud cause of action is not merely a malpractice claim with a claim for concealment of malpractice superimposed on it, the parallel nature of the damages is not determinative of whether the fraud claim is governed by the shorter statute of limitations.

We are cognizant of the Court's concern, expressed in *Simcuski v Saeli* (*supra*), that we guard against permitting a fraud claim which is actually "subjecting [a professional] to greater exposure to liability [than the Legislature intended] in consequence of errors of professional judgment" (44 NY2d at 453). Here, however, since the fraud claim is not based simply upon errors in professional judgment, but is also "predicated on proof of the commission of an intentional tort" (*id.*), reinstating plaintiff's claim of fraud is not contrary to legislative intention.

Finally, we cannot determine on the record before us whether the fraud cause of action is time-barred. An action for fraud must be brought within "the greater of six years from the date the cause of action accrued or two years from the time the

plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it" (CPLR 213 [8]). If defendants made the charged statements in 1999, as the motion court indicated, they fall within the six-year prong of the fraud statute of limitations (*see* CPLR 213 [8]). But, even if defendants made those statements more than six years before plaintiff filed this lawsuit, an issue of fact remains as to whether plaintiff could have discovered the fraud with reasonable diligence more than two years before she commenced this action. Even if defendants made their misrepresentation before April 7, 1997, the two-year discovery rule may serve to render the action timely. Although, as the motion court noted, plaintiff indicated her belief that her income should not have been reported on a form 1099, she was reassured to the contrary by defendant Schultz. "[M]ere suspicion will not constitute a sufficient substitute" for knowledge of fraud (*Erbe v Lincoln Rochester Trust Co.*, 3 NY2d 321, 326 [1957]; *see also K&E Trading & Shipping v Radmar Trading Corp.*, 174 AD2d 346, 347 [1991]), but "[w]here it does not conclusively appear that a plaintiff had knowledge of facts from which the fraud could reasonably be inferred, . . . the question should be left to the trier of the facts" (*Trepuk v Frank*, 44 NY2d 723, 725 [1978]).

Accordingly, the order of the Supreme Court, New York County (Debra A. James, J.), entered August 2, 2005, which granted defendants' motion for summary judgment dismissing the complaint, should be modified, on the law, to deny the motion as to plaintiff's fraud cause of action, and otherwise affirmed, without costs.

BUCKLEY, P.J., WILLIAMS, SWEENY and MALONE, JJ., concur.

Order, Supreme Court, New York County, entered August 2, 2005, modified, on the law, to deny defendants' motion for summary judgment as to plaintiff's fraud cause of action, and otherwise affirmed, without costs.